**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GIITOU NEOR and TYRONE WALLACE,
*on behalf of themselves, FLSA Collective Plaintiffs,*
*and the Class,*

                     Plaintiffs,

     v.

ACACIA NETWORK, INC.,
   d/b/a ACACIA NETWORK,
ACACIA NETWORK HOUSING INC.,
   d/b/a ACACIA NETWORK,
PROMESA RESIDENTIAL HEALTH CARE
FACILITY, INC.,
   d/b/a PROMESA, and
JOHN DOE CORP 1-100,

                  Defendants.

Case No.: 22-cv-04814 (ER)


# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
# MOTION TO CERTIFY CLASS AND APPOINT CLASS COUNSEL


Lee Litigation Group, PLLC
C. K. Lee, Esq. (CL 4086)
148 West 24th Street, Eighth Floor
New York, NY 10011
Tel: (212) 465-1188
Fax: (212) 465-1181

*Attorneys for Plaintiffs, FLSA Collective Plaintiffs, and the Class*

# TABLE OF CONTENTS

EXHIBITS ................................................................................................................. ii

TABLE OF AUTHORITIES ..................................................................................... iv

I.      PRELIMINARY STATEMENT ..................................................................1

II.     DEFENDANTS' CLASS SAMPLING AND WAGE POLICIES ....................................2

        A.      Summary of Analysis from Defendants' Class-Wide Production ......................... 3

        B.      Summary of Key Admissions from Depositions of Defendants' Witnesses ......... 3

        C.      Summary of Defendants' Common Wage Policies and Practices ......................... 4

III.    PLAINTIFFS' CLASS CLAIMS ...................................................................5

        A.      Failure to Pay All Wages Earned Because of Automatic Meal Break Deductions  7

        B.      Failure to Pay All Wages Earned Because of Uncompensated, Off-the-Clock
                Work ................................................................................................ 19

IV.     PLAINTIFF SATISFIES ALL REQUIREMENTS OF RULE 23 ...................................26

        A.      The Class Is So Numerous that Joinder Is Impracticable .................................. 28

        B.      Commonality and Typicality Requirements Are Met.......................................... 29

        C.      Plaintiffs Will Adequately Represent the Class.................................................... 31

        D.      Common Questions of Law and Fact Predominate ............................................. 32

        E.      Class Treatment Is Superior to Other Alternatives ............................................. 34

        F.      Plaintiffs' Counsel Should Be Appointed as Class Counsel................................ 35

V.      CONCLUSION..........................................................................................36

**EXHIBITS**

**(attached to the Declaration of C.K. Lee in Support of Plaintiffs' Motions for Class Certification)**

**Exhibit 1**       Proposed Order

**Exhibit 2**       Proposed Notice of Class Action

**Exhibit 3**       Excerpts from Plaintiffs' and Opt-In Plaintiffs Deposition Testimonies and list of all Plaintiffs and Opt-In Plaintiffs deposed

**Exhibit 4**       Plaintiff Neor's Email to Supervisors

**Exhibit 5-A**     Sample Time Records

**Exhibit 5-B**     Sampling Time Records for Plaintiff Wallace from Defendants' Production

**Exhibit 5-C**     Sample Time Records for Plaintiff Neor from Defendants' Production

**Exhibit 5-D**     Sample Time Records for Class members with Scheduled Shifts Recorded and 1-Hour Automatic Meal Break Deductions

**Exhibit 5-E**     Sample Time Records for Class members with Actual Hours Recorded and Varied Automatic Meal Break Deductions from Defendants' Class Production

**Exhibit 5-F**     Chart illustrating Plaintiffs' Analysis of Defendants' Class Production

**Exhibit 6**       Katrina Jones Memorandum to Employees

**Exhibit 7-A**     Katrina Jones Deposition

**Exhibit 7-B**     William Brooks Deposition

**Exhibit 8**       Chart Describing Sample Emails Sent Outside Work Hours

**Exhibit 9**       Gittou Neor Deposition Transcript

**Exhibit 10**      Tyrone Wallace Deposition Transcript

**Exhibit 11**      Melysa Exolas Deposition Transcript

**Exhibit 12**      Tearah Chestnut Deposition Transcript

**Exhibit 13**      Clarice Robinson Deposition Transcript

**Exhibit 14**      Akeem Ford Deposition Transcript

**Exhibit 15**      Cayon Dennis Deposition Transcript

**Exhibit 16**      Chawanda Osborne Deposition Transcript

**Exhibit 17**      Jennifer Stubbs Deposition Transcript

**Exhibit 18**      Vanessa Goersmeyer Deposition Transcript

**Exhibit 19**      Yaw Brobbey Deposition Transcript

**Exhibit 20**      Moises Figueroa Deposition Transcript

**Exhibit 21**      Karen Brehm-Callaci Deposition Transcript

**Exhibit 22**      Melissa Fonseca Deposition Transcript

**Exhibit 23**      Porschea Clarke Deposition Transcript

**Exhibit 24**      Dayana Jean-Gilles Deposition Transcript

**Exhibit 25**      Jaymie Butler Deposition Transcript

**Exhibit 26**      Josephine Rivera Deposition Transcript

**Exhibit 27**      Unice Williams Deposition Transcript

**Exhibit 28**      Shantel Delaney Deposition Transcript

**Exhibit 29**        Donna Gittens Deposition Transcript
**Exhibit 30**        Karen Brehm-Callaci Emails and Timesheets
**Exhibit 31**        Tearah Chestnut Emails and Timesheets
**Exhibit 32**        Porschea Clarke Emails and Timesheets
**Exhibit 33**        Cayon Dennis Emails and Timesheets
**Exhibit 34**        Melysa Exolas Emails and Timesheets
**Exhibit 35**        Moises Figueroa Emails and Timesheets
**Exhibit 36**        Akeem Ford Emails and Timesheets
**Exhibit 37**        Donna Gittens Emails and Timesheets
**Exhibit 38**        Vanessa Goersmeyer Emails and Timesheets
**Exhibit 39**        Dayana Jean-Gilles Emails and Timesheets
**Exhibit 40**        Chawanda Osborne Emails and Timesheets
**Exhibit 41**        Josephine Rivera Emails and Timesheets
**Exhibit 42**        Clarice Robinson Emails and Timesheets
**Exhibit 43**        Jennifer Stubbs Emails and Timesheets
**Exhibit 44**        List of Certified Class Action Cases with C.K., Lee, Esq. as Class Counsel

# TABLE OF AUTHORITIES

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184 (2013) .................................... 27

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ....................................................... 20

*Ansari v. New York Univ.*, 179 F.R.D. 112 (S.D.N.Y. 1998) ....................................................... 28

*Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81 (S.D.N.Y. 2001) .............................. 30

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52 (2d Cir. 2000).......................... 31

*Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144 (S.D.N.Y. 2002).............................. 30

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) ...................................... 30

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) .................................................................. 26

*Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995) ....................................... 28

*Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152 (S.D.N.Y. 2008)............................... 2, 29, 30, 32

*Duchene v. Michael L. Cetta, Inc.*, 244 F.R.D. 202 (S.D.N.Y. 2007) ........................................... 2

*Eisen v. Carlisle & Jacquelin*, 391 F.2d 555 (2d Cir. 1968) ............................................... 27, 28

*Flores v. Anjost Corp.*, 284 F.R.D. 112 (S.D.N.Y. 2012)................................................. 28, 29, 32

*Garcia v. Pancho Villa's of Huntington Village, Inc.*, 281 F.R.D. 100 (E.D.N.Y. 2011) ...............
........................................................................................................................... 2, 29, 30, 35

*Gonzalez v. Nicholas Zito Racing Stable, Inc.*, 2008 U.S. Dist. LEXIS 27598 (E.D.N.Y. Mar. 31,
2008) ................................................................................................................................ 34

*Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir. 1968) ..................................................................... 2

*Hamelin v. Faxton-St. Luke's Healthcare*, 274 F.R.D. 385 (N.D.N.Y. 2011)............................ 32

*Hamelin v. St. Luke's Healthcare*, 274 F.R.D. 385 (N.D.N.Y. 2011)............................................ 2

*Hernandez v. JRPAC Inc.*, 2016 U.S. Dist. LEXIS 75430 (S.D.N.Y. June 9, 2016) .................. 20

*Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363 (S.D.N.Y. 2007)......................... 28, 35

*In re Fosamax Prod. Liability Litig.*, 248 F.R.D. 389 (S.D.N.Y. 2008)..................................... 27

*In Re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ............................................ 26

*Kowalski v. YellowPages. com, LLC*, 2012 WL 1097350 (S.D.N.Y. Mar. 31, 2012) ................. 27

*Lee v. ABC Carpet & Home*, 236 F.R.D. 193 (S.D.N.Y. 2006) ................................................... 2

*Leone v. Ashwood Fin., Inc.*, 257 F.R.D. 343 (E.D.N.Y. 2009) ................................................. 32

*Literary Works in Elec. Databases Copyright Litig. v. Thomson Corp.*, 654 F.3d 242 (2d Cir. 2011)
........................................................................................................................................ 32

*Marisol A. v. Guiliani*, 126 F.3d 372 (2d Cir. 1997) ...................................................... 27, 29, 30

*Martinez v. Ayken, Inc.*, 2016 U.S. Dist. LEXIS 25556 (E.D.N.Y. Feb. 29, 2016).... 31, 32, 33, 35

*Mendoza v. Casa De Cambio Delgado, Inc.*, 2008 U.S. Dist. LEXIS 61557 (S.D.N.Y. Aug. 12, 2008) .................................................................................................................................... 33

*Moore v. Painewebber, Inc.*, 306 F.3d 1247 (2d Cir. 2002) ........................................................ 33

*Morris v. Alle Processing Corp.*, 2013 U.S. Dist. LEXIS 64534 (E.D.N.Y. 2013) .................... 28

*Niemiec v. Ann Bendick Realty*, 2007 U.S. Dist. LEXIS 98840 (E.D.N.Y. Mar. 30, 2007)......... 27

*Perez v. Allstate Ins. Co.*, 2014 U.S. Dist. LEXIS 130214 (E.D.N.Y. Sep. 16, 2014) ................ 35

*Pino v. Harris Water Main & Sewer Contractors Inc.*, 2021 U.S. Dist. LEXIS 157072 (E.D.N.Y. Aug. 19, 2021) .............................................................................................................................. 2

*Poplawski v. Metroplex on the Atl., LLC*, 2012 U.S. Dist. LEXIS 46408 (E.D.N.Y. Apr. 2, 2012) ................................................................................................................................................... 33

*Rosario v. Valentine Ave. Disc. Store, Co.*, 2013 U.S. Dist. LEXIS 77183 (E.D.N.Y. May 31, 2013) ................................................................................................................................................... 33

*Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590 (2d Cir. 1986) ................................................. 33

*Shabazz v. Morgan Funding Corp.*, 269 F.R.D. 245 (S.D.N.Y. 2010)........................................... 2

*Spread Enters., Inc. v. First Data Merchant Servs. Corp.*, 298 F.R.D. 54 (E.D.N.Y. 2014) ....... 28

*Trinidad v. Breakaway Courier Sys., Inc.*, 2007 U.S. Dist. LEXIS 2914 (S.D.N.Y. 2007) ... 33, 34

*Velez v. Majik Cleaning Serv.*, 2005 U.S. Dist. LEXIS 709 (S.D.N.Y. Jan. 18, 2005) ............... 30

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) ...................................................... 29, 30

*Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.)*, 280 F.3d 124 (2d Cir. 2001)........................................................................................................................ 32

*Whitehorn v. Wolfgang's Steakhouse, Inc.*, 275 F.R.D. 193 (S.D.N.Y. 2011) ........................... 35

*Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240 (S.D.N.Y. 2008) ........................................ 20

**STATUTES**

29 U.S.C. § 216(b) ......................................................................................................................... 1

**RULES**

Fed. R. Civ. P. 23 ................................................................................................................... passim

Fed. R. Civ. P. 23(a) ...................................................................................................... 26, 27, 33

Fed. R. Civ. P. 23(a)(2) ............................................................................................................... 29

Fed. R. Civ. P. 23(a)(3) ............................................................................................................... 30

Fed. R. Civ. P. 23(a)(4) ............................................................................................................... 31

Fed. R. Civ. P. 23(b) ................................................................................................................... 26

Fed. R. Civ. P. 23(b)(3)............................................................................................ 27, 32, 33, 34

Fed. R. Civ. P. 23(g) ................................................................................................................... 35

## I.    PRELIMINARY STATEMENT

On April 1, 2024, Named Plaintiffs Gittou Neor and Tyrone Wallace, alongside Opt-In Plaintiffs Melysa Exolas, Tearah Chestnut, and Clarice Robinson, moved to certify a 216(b) FLSA collective consisting of all current and former non-exempt employees, including, but not limited to, housing specialists, social workers, case managers, case workers, counselors, CASAC counselors, direct care staff, administrative staff, employed by Defendants ACACIA NETWORK, INC., d/b/a ACACIA NETWORK, ACACIA NETWORK HOUSING INC., d/b/a ACACIA NETWORK, PROMESA RESIDENTIAL HEALTH CARE FACILITY, INC., d/b/a PROMESA, and JOHN DOE CORP 1-100 ("Defendants" or "Acacia Network"), throughout New York State due to Defendants systematically depriving employees of overtime wages earned by (1) automatically deducting meal breaks from employees' compensable hours while also requiring them to work through their breaks and (2) requiring employees to work outside their scheduled hours while preventing such work from being properly recorded and compensated.

On March 31, 2025, the Court issued an Opinion & Order ("Order") substantially granting Plaintiffs' conditional collective certification motion. Plaintiffs now seek the certification of a Rule 23 class for the same violations under New York Labor Law ("NYLL"). The issues are the same, the only difference being that NYLL covers the underpayment of both regular and overtime hours while the FLSA only covers overtime shortfalls. By this motion, Plaintiffs seek the relief detailed in their Proposed Order, annexed as **Exhibit 1** to the Declaration of C.K. Lee in Support of Plaintiffs' Motion for Class Certification ("Lee Decl."). Plaintiffs' Proposed Notice of Class Action is annexed thereto as **Exhibit 2**.

In support of this motion, Plaintiffs have voluminous evidence comprised of 5 sworn declarations, deposition testimony from 21 Plaintiffs and Opt-In Plaintiffs, and employee wage and hour records. Deposition testimony of Defendants' witnesses also confirms Plaintiffs' claims.

While the standard for certifying a Rule 23 class is more demanding than that for certifying an FLSA collective, it is still the case that "if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." *Shabazz v. Morgan Funding Corp.*, 269 F.R.D. 245, 249 (S.D.N.Y. 2010) (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968)). And as with collective certification, "[o]n a motion to certify a class, a court must accept all allegations in the pleadings as true, but should not determine or resolve the merits of the claims of the case." *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 202 (S.D.N.Y. 2006). "In addition, 'where [as here] a collective action under the FLSA that is based on the same set of facts has been approved, there is an inclination to grant class certification of state labor law claims.'" *Hamelin v. St. Luke's Healthcare*, 274 F.R.D. 385, 392 (N.D.N.Y. 2011) (quoting *Shabazz*, 269 F.R.D. at 249). *See also Lee*, 236 F.R.D. at 202-03 (same); *Garcia v. Pancho Villa's of Huntington Village, Inc.*, 281 F.R.D. 100, 104-5 (E.D.N.Y. 2011) (same); *Pino v. Harris Water Main & Sewer Contractors Inc.*, 2021 U.S. Dist. LEXIS 157072, at *7-8 (E.D.N.Y. Aug. 19, 2021) (same). "[C]ourts in the Second Circuit routinely certify class action[s] in FLSA matters so that New York State and federal wage and hour claims are considered together." *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 163 (S.D.N.Y. 2008) (quoting *Duchene v. Michael L. Cetta, Inc.*, 244 F.R.D. 202, 204 (S.D.N.Y. 2007)).

## II.    DEFENDANTS' CLASS SAMPLING AND WAGE POLICIES

During discovery, Defendants produced a 10% sampling of wage and hour documents for 967 employees employed at approximately 70 different locations operated by Defendants. This sampling included 96 employees with the titles: Housing Specialist, Social Worker, Case Manager, and Counselor. While Defendants employ several thousand putative Class members, this limited class sampling was produced under Court order.

Review of Defendants' class production confirms that the unlawful policies described above occurred at all of Defendants' locations throughout New York State, without regard to employee title, location, schedule, or status. As attested to by Plaintiffs and Opt-In Plaintiffs, all Class members were subjected to time shaving through automatic meal break deductions and being required to work past the end of their scheduled shifts without compensation.

### A. Summary of Analysis from Defendants' Class-Wide Production

From Defendants' 10% class sampling, Plaintiffs included analysis of 70 putative Class members for the instant motion. Plaintiffs' analysis confirmed that 60 of 70 sampled Class members were subjected to automatic meal break deductions of exactly 1 hour, which is approximately 85.71%[1]. Given the different employment periods worked by each Class member, this results on average in 233 unpaid hours due to the automatic meal break deductions per Class member. Attached as **Exhibit 5-F** is a chart illustrating the employment period of the sampled Class members and the amount of unpaid meal breaks due to Defendants' automatic 1 hour meal break deductions each shift. As shown, Class members worked an average employment period of approximately 244 days, suffering between 4 hours to 1,093 hours of time shaving due to Defendants' 1 hour automatic meal break deductions. *Id*. The violations are also supported by deposition testimony. *See* **Exhibit 3**; *see also* **Exhibits 7-A**, **7-B**, **Exhibits 9 – 29**.

### B. Summary of Key Admissions from Depositions of Defendants' Witnesses

(1) All hourly employees across all of Defendants' locations under the Acacia Network umbrella were subjected to the same wage policeis. *See* **Exhibit 7-A**, Deposition Transcript of Katrina Jones, Acacia Network Senior Vice President Human Resources & Talent Management ("Jones Dep.") at 11:17-12:8.

(2) Employees across all locations under the Acacia Network umbrella were always subjected to automatic meal break deductions … regardless of title or location or whether employees took a lunch break at all. *See Id*. at 35:5-13.

---

[1] The balance of the sampled Class members had half hour breaks, or a combination of half hour and full hour meal break deductions. *See* Exhibit 5-E, but 100% of sampled Class members suffered wage shortfalls.

(3) Defendants did not track the lunch breaks of employees to know if they were taking the break. *See Id.* at 35:5-13; 52:12-21; 82:1-4.
(4) At no time after the current lawsuit was filed did Defendants' representative investigate Plaintiffs' claims, or check the violations, despite having access to Plaintiffs' and Class members' employment documents. *See Id.* at 66:2-3-69.

### C.  Summary of Defendants' Common Wage Policies and Practices

Employees across all locations under the Acacia Network umbrella were always subjected to automatic meal break deductions of either a half hour or 1 hour, regardless of title, location or whether employees took a lunch break at all. *See* **Exhibit 7-A** at 35:5-13. Yet, Defendants did not track the lunch breaks of employees to know if they were taking the break. *Id* at 34:24-35:4. This was confirmed multiple times during the deposition of Ms. Jones.

> Q. Oh, just for clarity, you'll notice that for Tyron, he also does not punch out for meal breaks, correct?
> A. Correct.
> Q. That's consistent with your statement earlier that throughout Acacia Network employees do not punch out for meal breaks, correct?
> A. Correct.
> Q. And meal breaks are not tracked, correct?
> A. Correct.

**Exhibit 7-A** at 52:12-21.

> Q. Okay. But the policy about automatically deducting for meals and not tracking it, that's consistent for all locations, correct?
> A. Not tracking lunch, yes, that's consistent.

*Id.* at 82:1-4.

Mr. Brooks, the Controller for Payroll of Acacia Network also confirmed this policy of auto deductions for meal breaks without tracking the actual breaks.

> A. Yes. The payroll record may demonstrate the employee worked at the facility for 11 hours and they may only be paid for 10.5 as an example because there's half an hour unpaid lunch.
> Q. That's an auto deduct; right?
> A. Yes.
> Q. That's the policy for all Acacia Network employees; right?
> A. Yes …
> …
> Q. I believe whether an employee actually takes lunch or not, the mealtime is deducted anyway; right?

4

…
A. We have an auto setup, auto deduction. We have an auto deduction set up. I'm waiting for the second part of your question.
Q. I think you answered the question. And you don't track whether an employee actually eats their lunch or not; right?
A. I don't personally track it, no.
Q. And payroll doesn't track it; right?
A. Payroll doesn't personally check it either.
Q. And HR doesn't track it either; right?
A. I can't answer that question.
Q. What?
A. I can't speak for HR.

**Exhibit 7-B**, Deposition of William Brooks ("Brooks Dep.") at 18:17-19:21.

This far in discovery, no documents showing any lunch tracking mechanism have been produced by Defendants.

## III.    PLAINTIFFS' CLASS CLAIMS

Plaintiffs seek class certification with respect to two time-shaving claims:

(1) Failure to pay all wages earned in violation of NYLL because Plaintiffs and Class members were required to work through meal breaks that were automatically deducted from their compensable time;

(2) Failure to pay all wages earned in violation of NYLL because Plaintiffs and Class members were required to perform uncompensated, off-the clock work outside their officially scheduled shifts.

Plaintiffs incorporate by reference all the materials filed with the motion for collective certification. Plaintiffs also take the following facts as true based on the Court's Order certifying the FLSA collective, thereby obviating the need to reargue them here:

(1) Defendants constitute a single integrated enterprise. The Court found that "Plaintiffs have adequately alleged at this stage that Defendants operate as a single integrated enterprise for purposes of potential FLSA liability." Order at 10. As the FLSA and NYLL standards for finding a single integrated enterprise standard are the same, the standard has also been satisfied for purposes of the instant motion.

(2) As confirmed by Defendants' own representatives, "neither the department of human resources nor payroll tracked the actual hours employees spent on lunch and that Defendants had an auto-deduction policy of employees' lunch hours from their pay." Order at 13.

(3) As confirmed by Defendants' own representative, "employees who clocked out after their scheduled times would be subject to verbal reprimand." Order at 14.

Plaintiffs will satisfy the requirements of Rule 23 through (1) the Declarations of Gittou Neor, Tyrone Wallace, Melysa Exolas, Tearah Chestnut, and Clarice Robinson; (2) the class sampling of time and pay records produced by Defendants; (3) work emails sent by Plaintiffs and Opt-In Plaintiffs showing that they were working outside scheduled shifts; (4) Defendants' stated wage policies, and (5) deposition testimony from Plaintiffs Neor and Wallace, and all 21 Opt-In Plaintiffs who were deposed (*see* **Exhibit 3** for a list of all Plaintiffs and Opt-In Plaintiffs along with supporting deposition testimony). These excerpts include the relevant page/line numbers from the transcripts, which are also annexed to the Lee Declaration.

These individuals are representative of a broad swath of Defendants' employees in having occupied 9 different positions: (1) Social Worker; (2) Housing Specialist; (3) CASAC Counselor; (4) Case Manager; (5) Case Worker; (6) Shift Supervisor; (7) Client Care Coordinator; (8) Substance Abuse Counselor; and (9) Sr. Case Manager. They are also representative in having worked at a wide variety of locations—25 between them. Representative excerpts from the above individuals' deposition testimonies are attached as **Exhibit 3**.

Plaintiffs and Opt-In Plaintiffs all attest that they were time shaven by being required to work through automatically deducted meal breaks and being required to work past the end of their scheduled shifts without compensation. This was not random for individual employees but the necessary and predictable result of how Defendants' policies interacted with the nature of the workplace. Acacia employees serve socio-economically disadvantaged individuals with many life problems. This leads to many unpredictable contingencies to which Class members must respond immediately, whether in their offices or in the field.

There can be no question that the policies leading to uncompensated work were implemented to all Class members regardless of location. Ms. Jones testified that employees across

Defendants' locations under the Acacia Network umbrella were subjected to the same wage policies, with differences only depending on whether employees were union workers or not, or whether employees were treated as exempt or nonexempt. *See* **Exhibit 7-A** at 11:17-12:8.

### A. Failure to Pay All Wages Earned Because of Automatic Meal Break Deductions

Automatic meal break deductions are unlawful when they extract uncompensated labor from employees by requiring them, whether explicitly or implicitly, to perform work during purported breaks. Defendants' meal break time shaving is shown on the records and confirmed by deposition testimony.

Defendants automatically deducted 30 minutes or one hour from their employees' payments on the basis of purported meal breaks. Neor Decl. ¶ 10, Wallace Decl. ¶ 6. However, Defendants instructed Plaintiffs and Class members to work continuously without taking a break (*id*), and Defendants did not track whether employees took breaks at all or worked through their meal breaks. *See* **Exhibit 7-A** at 34:24-35:4; 52:12-21; 82:1-4. Yet, Plaintiffs regularly worked through their meal breaks and often observed their fellow employees also working through meals without receiving proper compensation. Neor Decl. ¶¶ 10-11; Wallace Decl. ¶¶ 6-7; Exolas Decl. ¶ 4; Chestnut Decl. ¶ 5; Robinson Decl. ¶ 6. Although Plaintiffs worked at different locations and in different positions, their need to work through their meal breaks came down to one simple unifying constant—their heavy workload and Defendants' constant demands.

Class members do not actually punch in or out for actual break time, but instead, Defendants automatically deducted break time from the hours worked by Class members. The various methods by which employees entered time as shown from Defendants' production of class-wide documents are: (i) handwritten time sheets with the start and end times either rounded to the exact whole or half hour, or non-rounded; and (ii) electronic time sheets with the start and end

times either rounded to the exact whole or half hour, or non-rounded. Below are examples of relevant data from Defendants' production of time sheet for Plaintiffs and Class members.

| Date | In | Out | Hours Paid | Actual Recorded Hours |
|------|-----|------|------------|-----------------------|
| 8/24/20 | 9:00 | 5:00 | 7 | 8 |
| 8/25/20 | 9:00 | 5:00 | 7 | 8 |
| 8/26/20 | 9:00 | 5:00 | 7 | 8 |
| 8/27/20 | 9:00 | 5:00 | 7 | 8 |
| 8/28/20 | 9:00 | 5:00 | 7 | 8 |
| 8/31/20 | 9:00 | 5:00 | 7 | 8 |
| 9/1/20 | 9:00 | 5:00 | 7 | 8 |
| 9/2/20 | 9:00 | 5:00 | 7 | 8 |
| 9/3/20 | 9:00 | 5:00 | 7 | 8 |
| 9/4/20 | 9:00 | 5:00 | 7 | 8 |
| | | Total | 70 | 80 |

| Date | In | Out | Hours Paid | Actual Recorded Hours |
|------|-----|------|------------|-----------------------|
| 2/22/21 | 9:11 | 5:11 | 7 | 8 |
| 2/23/21 | 9:00 | 5:00 | 7 | 8 |
| 2/24/21 | 9:42 | 5:43 | 7 | 8.02 |
| 2/25/21 | | | 7* (sick day) | 7* |
| 2/26/21 | 9:12 | 5:35 | 7 | 8.38 |
| 3/1/2/21 | 9:07 | 5:07 | 7 | 8 |
| 3/2/21 | 9:00 | 5:00 | 7 | 8 |
| 3/3/21 | 9:32 | 5:00 | 6.5 | 7.47 |
| 3/4/21 | 9:00 | 5:00 | 7 | 8 |
| 3/5/21 | 9:00 | 5:00 | 7 | 8 |
| | | Total | 69.5 | 78.87 |

**Exhibit 5-B**, Bates Stamp Defendant ANHI 000222, 000234, Sampling of Wallace's Time Sheets

| Date | Time In | Time Out | Hours Paid | Actual Recorded Hours |
|------|---------|----------|------------|-----------------------|
| 2/10/19 | 9:27 | 5:36 | 7.5 | 8.15 |
| 2/11/19 | 10:15 | 6:28 | 7.75 | 8.22 |
| 2/12/19 | 10:05 | 6:05 | 7.5 | 8 |
| 2/13/19 | 9:58 | 7:10 | 8.75 | 7 |
| 2/14/19 | 9:57 | 7:07 | 9 | 9.17 |
| 2/17/19 | 8:29 | 4:20 | 7.5 | 7.85 |
| 2/18/19 | 8:00 | 3:30 | 7.5 (Holiday) | 7.5 |
| 2/19/19 | 8:07 | 6:21 | 9.75 | 10.23 |
| 2/20/19 | 9:48 | 7:16 | 9 | 9.47 |
| 2/21/19 | 8:50 | 6:58 | 9.75 | 10.13 |
| | | Total | 84 | 85.72 |

**Exhibit 5-C**, Bates Stamp Defendants Promesa 000087, Sampling of Neor's Time Sheets.

As shown above, in the "Hours Worked" column, for Plaintiffs Neor and Wallace, Defendants always automatically deduct a meal break from each shift, regardless of how

Defendants' required Plaintiffs to enter their time, *e.g.,* electronically or by hand, with rounded hours or non-rounded hours. *Id.* On the time sheets provided above for Plaintiff Wallace, Defendants required him to both fill in his time electronically and by hand, at times based on his shift, and at times based on actual start and end times. Regardless, as shown, Defendants always automatically deducted a meal break from. *See* **Exhibit 5-B**, ANHI 000222, 000234. Plaintiff Neor's time was entered electronically, and Defendants automatically deducted meal breaks from each shift. At times, these meal breaks were exactly 30 minutes, and at other times the automatic meal break duration varied. *See* **Exhibit 5-C**, Promesa 000087. Regardless, Plaintiffs attest to working through meal breaks and Defendants never tracked the breaks of Class members. *See* **Exhibit 7-A** at 34:24-35:4; 52:12-21; 82:1-4.

Defendants' production of Class members' time sheets showed that the automatic meal deductions were applied to all employees at all locations, generally in one hour increments, similar to Plaintiffs. In fact, out of the 96 employees included in Defendants' class-wide sampling, only a handful (approximately 10%) experienced automatic meal break deductions for 30 minutes per shift. The remainder were subjected to 1 hour automatic meal break deductions per shift. At times, depending on whether the start and end times were actual or based on shifts, Defendants' meal break deduction even exceeded 1 hour. Attached as **Exhibit 5-D** and **5-E** are time sheets for the sampled Class members from Defendants' production.

**Exhibit 5-D** includes a sampling of time sheets for Class members from Defendants' production with start and end times based on scheduled shifts and automatic 1 hour meal break deductions. Out of the Class members included in Defendants' class sampling, 60 of the employees sampled by Plaintiffs were subjected to automatic meal break deductions of exactly 1 hour, which equals more than 85% who were time shaved in exactly the same way as Plaintiff Wallace. Based

on the sampling and the different employment periods worked by each Class member, this results on average in 223.14 unpaid hours per Class member. Attached as **Exhibit 5-F** is a chart illustrating the employment period of the Class member included in Defendants' class production and the resulting amount of unpaid meal breaks suffered by each. As shown on **Exhibit 5-F**, Class members worked an average employment period of approximately 244 days and suffered anywhere between 4 hours to 1,093 hours of time shaving due to Defendants' 1 hour automatic meal break deductions. *Id*.

Although the automatic 1 hour meal break deductions with start and end times based on scheduled shifts occurred far more frequently, approximately 10% of Class members recorded actual start times. *See* **Exhibit 5-E**. When Class members' actual start end times for are recorded, the automatic meal break deduction varies, and employees are paid for scheduled shifts. At times, this results in Defendants' meal break deduction exceeding 1 hour at times, as shown. *Id*.

| Date | In | Out | Hours Paid | Actual Hours Recorded | Meal Break Deduction |
|---|---|---|---|---|---|
| Sat 5/13 | | | | | |
| Sun 5/14 | | | | | |
| Mon 5/15 | 9:46 | 5:00 | 6.25 | 7.23 | 0.98 |
| Tue 5/16 | 8:57 | 5:00 | 7.0 | 8.05 | 1.05 |
| Wed 5/17 | 9:02 | 5:31 | 7.5 | 8.48 | 0.98 |
| Thu 5/18 | 8:43 | 5:14 | 7.5 | 8.52 | 1.02 |
| Fri 5/19 | 9:01 | 5:07 | 7.0 | 8.10 | 1.10 |
| Sat 5/20 | | | | | |
| Sun 5/21 | | | | | |
| Mon 5/22 | 10:31 | 6:58 | 7.5 | 8.45 | 0.85 |
| Tue 5/23 | 10:29 | 7:22 | 7.75 | 8.88 | 1.13 |
| Wed 5/24 | 1:10 | 8:48 | 6.5 | 7.83 | 1.13 |
| Thu 5/25 | 10:06 | 6:27 | 7.5 | 8.35 | 0.85 |
| Fri 5/26 | 8:07 | 4:30 | 7.5 | 8.38 | 0.88 |
| | | **Total** | **72.0** | **82.08** | **10.08** |

**Exhibit 5-E**, Bates Stamp Defendants 003271.

As shown by **Exhibits 5-D** and **5-E**, employees never clocked out for meal breaks but were still subjected to one form or another of Defendants' automatic meal break deductions. As can be seen, the variation in the meal break deduction is not due to more accurate reporting, but solely to obtain hours for paid work time based on scheduled shifts, so an excess fractional punch time will be added to the meal breaks. Defendants' class production for Class members, regardless of the location, demonstrates that they similarly suffered unpaid wages, for no other reason than Defendants' policy of time-shaving break times. *See* **Exhibit 5-D**, **Exhibit 5-E**, and **Exhibit 5-F**.

Plaintiffs attest to working regularly through meal breaks and attested to co-workers similarly being required to work through meal breaks. The Declarations of Plaintiffs and Opt-In Plaintiffs all show, in considerable detail, that Defendants did just that. *See* Chestnut Decl. ¶ 5 ("Based on my observations, all employees worked through their breaks because they were either interrupted by managers or were overworked and pressed on time to finish their work."); Exolas Decl. ¶ 5 ("Defendants gave me too much work to do and made me work through my breaks" and "Defendants knew that I always ate while working at the same time"); Neor Decl. ¶ 10 ("Defendants would constantly give me work to do while I was clocked out for my meal break! For example, during these supposed lunchbreaks, Defendants required me to attend meetings, pick up or transport children to other locations or appointments, and watch over the children while they had lunch."); Robinson Decl. ¶ 6 ("I was never able to actually take a real meal break because I had such a heavy caseload and there was always work to do. On top of this, if someone called out, I would have to cover their workload that day, and there was no break room where we could sit in peace to take a real break."); Wallace Decl. ¶ 6 ("during my meal breaks, Defendants required me to attend mandatory zoom calls, trainings, and meetings, or I was required to assist clients, show

11

the premises to prospective tenants, perform light repairs or cleaning, communicate with the hotel owners, contact pest control services, or perform any number of other miscellaneous tasks.").

Defendants cannot seriously argue they were unaware employees were working unpaid overtime hours. Three Plaintiff Declarations detail complaining to management about not being compensated for their off-the-clock work. *See* Exolas Decl. ¶ 3 ("However, I never got paid for any of these extra hours. I complained about this to my supervisor, but nothing changed."); Neor Decl. ¶ 9 ("Any time that an employee raised a work-related complaint to a manager or to Acacia Network's HR, Defendants would threaten back with lawsuits or punishment. Defendants told us several times that if we complained about their wage policies, Defendants would sue us for violating Defendants' privacy agreement."); Robinson Decl. ¶ 5 ("Whenever I asked my supervisors about this, they always said 'We didn't approve the overtime, so you won't get paid.'"). Plaintiffs also explain that the unlawful policies to which they were subjected were also applied to all fellow nonexempt employees. Chestnut Decl. ¶¶ 4, 7; Exolas Decl. ¶¶ 2, 3, 5, 6; Neor Decl. ¶¶ 3, 7, 8, 9, 10, 11; Robinson Decl. ¶¶ 3, 6; Wallace Decl. ¶¶ 3, 6, 7, 8, 9.

Defendants have, of course, argued that any time-shaving suffered by Plaintiffs consisted of isolated incidents, the result of rogue supervisors' decisions rather than any company-wide policy. But for obvious reasons, no violators of state or federal wage laws ever have their unlawful practices codified in an official policy. Despite Defendants' denials, deposition testimony submitted alongside this motion reveals consistent unlawful practices across many locations and job roles. Defendants may not have a formal policy of time-shaving, but their supervisors have been taught to employ the same set of ruses designed to bring about just this unlawful result.

Deposition testimony shows that while Class members are not explicitly told that they must work through uncompensated meal breaks, they are expected to be available to clients any time,

which has the consistent and predictable effect of forcing them to work through their breaks. Plaintiff Wallace explains that "if a client came to my door while I was attempting to eat my lunch, then the supervisor would open the door telling me I have a client outside waiting for me and would just proceed into my office." **Exhibit 3** at 5. Melysa Exolas explains that she could not leave the building for a free and clear meal break because employees "were directed not to leave the building in the event a resident or a client needed any assistance." **Exhibit 3** at 8. Clarise Robinson relates that "if a client knocked on the door, you couldn't tell them: Oh I'm on lunch. You couldn't tell them that, you had to be available to them." **Exhibit 3** at 16. Vanessa Goersmeyer states that she would often be unable to take her meal because if there are "clients who I don't get to see often and they come in during my lunch, I would be working during that lunch hour." **Exhibit 3** at 34. Jamie Butler explains that everyone knew employees were working through their breaks because "[t]he way that the open office is set up, you can see that they're on their lunch or they're trying to have their break, and they are being asked to see clients on their break." **Exhibit 3** at 48.

Class members often work outside their offices, and here, too, they faced consistent pressures and restrictions preventing them from taking free and clear meal breaks. Plaintiff Neor explains that she could not take free and clear lunch breaks because she could not leave the children in her charge unsupervised. *See* **Exhibit 3** at 1. Cayon Dennis explains that as a housing specialist, she was often "in the field" at meetings, which she couldn't leave for meal breaks. **Exhibit 3** at 24. Melissa Fonseca explains: "Sometimes I was outside all day with these clients and their kids, that I -- I was not allowed to eat lunch because I'm not going to sit and eat in front of a client that doesn't have $1 in his pocket and the kids are staring at me." **Exhibit 3** at 40.

Beyond the mandate to be continuously available to clients, time-consuming duties and unrealistic, often last-minute, deadlines frequently compelled Class members to work through their

breaks. Karen Brehm-Callaci explains that "the caseload was a ridiculous amount" and that, having been charged with admissions, "there was no way I could take lunch and have all of my work done." **Exhibit 3** at 39. Tearah Chestnut states that she and others had to work through lunch because of "work overload." **Exhibit 3** at 11. Porschea Clarke states that she could not take her lunch break because of "unrealistic deadlines and heavy case loads," as "[w]hen they brought something to your attention the week of and told you you had until the end of the week to upload a newly designed report." **Exhibit 3** at 42. Akeem Ford explains that management would assign him tasks that needed to be completed before the end of the day on pain of discipline or termination. As a result, "I don't know where I'm going to pull this extra time from, but if that time comes from out of my lunch break, then that time is coming from out of my lunch break." **Exhibit 3** at 23. Porschea Clarke relates that when she was faced with an unrealistic deadline, she was instructed by her supervisor to "[f]igure it out and if you have to use your lunch break, this deadline must be met." **Exhibit 3** at 43. Thus, Defendants were perfectly aware that employees were regularly working through meal breaks. Moises Figueroa explains that his supervisors were necessarily aware of this because they were "right there eating with me." **Exhibit 3** at 37.

Working through meal breaks was the rule rather than the exception at Acacia Network, and was the predicable consequence of the very nature of the workplace setting: a hectic, unpredictable environment where overburdened social service providers had to be continuously available to meet the needs of vulnerable populations that could not be abandoned just so these providers could have a free-and-clear lunch breaks. Josephine Rivera, who worked for Defendants for *over a decade* between 2008 and 2020, eloquently sums up the situation:

> Q. Does the -- does this policy here also state that an employee is not required to remain in the workplace for lunch?
> A. Yeah. It says you are not required to remain at the workplace. You could leave, but you can't leave if you got work on top of you and everybody pulling you. It does -- it sound -- it -- it sounds good on paper. But in reality, that's not how it was.

Q. Okay.· Was it the company's requirement that you were supposed to take a one-hour lunch break uninterrupted?
A. That's what the policy states, but that's not what actually happens. You -- whether you take lunch or not, an hour is being deducted anyway automatically from your work, you know, your -- your day.

You're -- you are entitled for lunch, that's not how it works because you're working through your lunch. There's times where you get a -- you don't even get a full meal. You get a bag of chips and a juice, and you eating while you doing work all day long.

Trust me. I've been with this -- I -- I've been with this company since 2008, and I don't ever think that I ever took an hour lunch because it's always been working, working, work. And it's not just me. It's everybody.

**Exhibit 3** at 51.

Aware that this situation would necessarily generate overtime hours, Defendants employed a variety of tactics to ensure that obtaining compensation for such work would be exceedingly difficult if not impossible. The crudest and most transparent of these stratagems was to physically eliminate overtime hours from employees' time-records. Chawanda Osborne states, "I've seen it with my own eyes. When the program directors and the operations managers are doing timesheets, I've been in their office and I've seen them take a line through someone's time and put less time."

**Exhibit 3** at 31. Similarly, Cayon Dennis explains, "So, it's 82 hours. I would only get paid the two hours. So, if they don't want to pay me the two hours, they would delete it, so that way it only looks like it's under 80." **Exhibit 3** at 26-27.  Asked whether she ever attempted to report the actual hours she worked, Dayana Jean-Gilles explained that "they handed me back the time sheet and told me to do it correctly." When she objected to this, she was told, "That's the policy. You have an issue, take it up with HR." Jean-Gilles did not escalate matters to HR for an obvious reason: "Every employee there told me it was a waste, that HR will not do anything about it. And very early on, I realized that HR didn't have our best interests at heart. HR was representing the company, so I felt it would be a waste of my time." **Exhibit 3** at 45.

Defendants also employed a range of subtler measures to prevent the recording of overtime hours arising from work performed during meal breaks (as well as from post-shift off-the-clock

work, discussed next section). First off, reporting of missed meal breaks was not easy. Asked whether he ever noted his missed meal breaks on his time sheet, Akeem Ford explained that "there's no space for that." Asked whether he could indicate the overtime in the time sheet's margins, he explained, "I didn't want to jeopardize my job by continuously writing on my time sheet that I didn't get a lunch." **Exhibit 3** at 21. While working through meal breaks was a routine occurrence at Acacia Networks, the automatic deduction implied that it was the exception, and so any employees who routinely indicated they had worked through lunch could be stigmatized and disciplined for having failed to complete their tasks with straight-time hours alone.

Beyond this tacit discouraging of the reporting of overtime, Defendants would often discourage it directly and explicitly. Vanessa Goersmeyer explains: "And we do get constant emails stating that they don't have any more overtime or they're telling us verbally they don't have any overtime so don't ask for any overtime or don't document any overtime." **Exhibit 3** at 33. In other words, Defendants characterized overtime compensation as a limited resource, thereby communicating that employees who were requesting more than their fair share of it were doing something wrong. Asked what Defendants meant in stating that "they've used up all the overtime," Ms. Goersmeyer responded, "I have no idea.· I thought if you worked overtime you get paid overtime.· I don't know what they used all the overtime meant." **Exhibit 3** at 34. An email from Plaintiff Neor to her supervisors, dated May 28, 2019, and annexed as **Exhibit 4**, provides contemporaneous evidence of the unlawful practices surveyed above:

> Hi Yenia, so due to the influx of cases since Don left I have been working to get cases updated. Also I had a lot to file which was done Sunday. All my new cases have preliminary TX plans done, I just had to file them.
> I do need to update older cases with notes and close out charts so I have not started on new cases.
> You have asked me to work on a package for two clients regarding insurance and if you can assist me with that it would be great since I could be working on the charts with the time I do have. In the three hours of overtime allotted I am still dealing with individual sessions, for example last night I updated Jameel grant and then had to stop to deescalate a

situation with [redacted] wanting to leave. That situation last an hour and a half and by the time I was finished it was 7:30. Please remember that we are required to have a weekly productivity of 28.

Also when Greta was checking the charts she observed the multiple times that I had to stop what I was doing to open doors on the floor so that also takes time away. Also remember that we do group at 10:45 then have to stay with our group for lunch. That also takes time out.

I will continue to work diligently today but it would not be that the cases will be all up to date as of COB today.

The email shows: (1) the limited number of overtime hours dispensed by Defendants was insufficient to complete assigned work; (2) Class members could not take free-and-clear meal breaks because of client demands; and (3) unpredictable, last minute work demands arose at the ends of shifts, for which it was impossible to pre-authorize overtime (more on this in next section).

The discouraging of overtime reporting sometimes turned into threats. Chawanda Osborne recounts: "I'm already under hours because I'm putting that I work 8:00 to 6:00 when I actually probably worked 8:00 to 8:00, 8:00 to 9:00. You understand, I'm putting 8:00 to 6:00 because I was scared. I was frightened because they told me that I would possibly be blackballed from overtime, so only put a certain amount of hours on my time sheet so I wouldn't be blackballed from overtime." **Exhibit 3** at 29. Dayana Jean-Gilles relates that other employees explained the rules of the game to her as follows: "Your work going to get done or you get – you're going to get written up. That was always what I was told. Make sure your work is done. If you got to take it home, take it home." **Exhibit 3** at 45. Given this threat and the general urgency of social services work, Class members could not wait to receive formal overtime authorization before putting in the hours required to complete pressing tasks.

The cumulative effect of all the above was to normalize Defendants' policy of not paying for overtime work that Defendants knew was being performed, so that anyone who forcefully demanded their proper wages would become a troublemaker in the eyes of supervisors and managers. Asked how her supervisor responded when informed that she had to work through meal

17

breaks, Chawanda Osborne explains that she was told: "It's okay. We all do it. They do it. We all do it. You know, sometimes that's just the way the ball bounces." **Exhibit 3** at 29. Confirming this characterization of Acacia's workplace culture, Vanessa Goersmeyer explains, "It was like a norm to stay later, it was a norm to not eat. It was a norm to be eating and have clients come in and see your office, you know." **Exhibit 3** at 35.

With these cultural norms in place, it is unsurprising that many Class members were reluctant to forcefully insist that their overtime work be compensated. There was always a high likelihood that Defendants would find one way or another to deny the overtime, and so raising the subject would only create tension and possibly jeopardize the employee's position or reputation. As Josephine Rivera put it when asked whether she complained to higher-ups about being undercompensated, "Yes. Yes. I asked them and nothing changed. Everything stood the same. I stopped asking." **Exhibit 3** at 51. Employees' immediate supervisors could be of no assistance because they were in the same boat and had no choice but to passively acquiesce to Defendants' policies. Of course, Plaintiffs do not argue that no Class member ever took a free-and-clear meal break or that no overtime pay was ever authorized. Defendants' unlawful time-shaving policies required plausible deniability, so there had to be some exceptions to the rule. But the exceptions were just that, and a matter of luck. Defendants' practices were well understood by Class members, for whom time-shaving was a routine part of working at Acacia Network. The record shows that employees regularly complained about this both to each other and to management and that Defendants were, therefore, perfectly aware of the situation:

> Q: Who complained about not being paid?
> A: The staff there, operations, case managers. I'd seen them in the building close to midnight and they're there for free.
> Q: Did they complain to you or are they complaining to someone else?
> A: We all like stood in the office and talked to each other about it and tried to figure out how we could rectify this, but nothing was done.
> Q: Did they tell you they complained to management?

> A: Yeah, of course
> Q: How many people told you they complained to management about not being paid for their time?
> A: The majority of staff.

Deposition of Tyrone Wallace, **Exhibit 3** at 6.

> Q: And how do you know they stayed past their shift?
> A: Well, we were all in the same -- well, we were paired, so there was times when Anthony was in my room, he shared a room with me so he would always stay past his shift.
> Q: Did any of these individuals ever tell you that they were not paid for that extra time that they worked?
> A: Yes
> Q: Who told you that?
> A: The case managers. We spoke amongst ourselves and they said that, they shared it
> Q: Who would those people be that told you that they were not paid for extra time specifically, if you remember?
> A: It was all of us: Clarice, Yemi, Kathy, when she was alive, Ms. Garcia and Anthony.

Deposition of Melysa Exolus, **Exhibit 3** at 9.

> Q: And your understanding was that none of these people were getting paid overtime?
> A: None of them were. We complained about it. Often had discussions about having meetings with the leadership to address it. We've had several meetings with the leadership.

Deposition of Dayana Jean-Gilles, **Exhibit 3** at 46.

### B.  Failure to Pay All Wages Earned Because of Uncompensated, Off-the-Clock Work

Defendants further time-shaved Plaintiffs and Class members by requiring them to work past the end of their shifts without compensation. *See* Chestnut Decl. ¶ 4 ("Twice every week, I was required to work past my scheduled shift for approximately one hour each time"); Exolas Decl. ¶ 2 ("no matter which schedule I was assigned, almost every shift, Defendants would instruct me to stay past my shift and keep working for 30 minutes to an hour"); Robinson Decl. ¶ 5 ("On a daily basis, Defendants would direct me to continue working after the end of my shift[]"); Wallace Decl. ¶ 4 ("Throughout my employment, Defendants scheduled me to work 5 days per week, from 9:00 a.m. to 5:00 p.m., for a total of 40 hours per week. However, almost every workday, Defendants would direct me to continue working, which I did until 6:00 p.m.").

Plaintiffs' allegations are corroborated and applied to all Class members (*see* **Exhibit 5-A-E**, sampled time records showing that employees' work time is routinely recorded in whole hours). These time records have not been rounded to the nearest quarter hour in accordance with a neutral rounding policy. Rather, they have been rounded down to the employee's pre-set schedule. Given the absurd improbability that so many employees would be working shifts of *exactly* eight (8) hours day after day, Defendants clearly are not recording the time employees actually worked but simply reproducing employees' shifts. This robotic consistency corroborates Plaintiffs' testimony that they were often required by supervisors to work past the end of shifts without compensation. Courts have declined to accept at face value the "metronomic consistency" of time records that "are implausibly identical, week in and week out." *Hernandez v. JRPAC Inc.*, 2016 U.S. Dist. LEXIS 75430, *18 (S.D.N.Y. June 9, 2016); *see also King v. Fedcap Rehab. Servs.*, 2022 U.S. Dist. LEXIS 18090 (S.D.N.Y. Feb. 1, 2022) (granting conditional collective certification after observing "that time worked was only ever recorded in whole numbers" and that this "suspicious uniformity" betokened "Defendants' policy of rounding down when employees worked past the end of their shift."). Moreover, given that Defendants' ostensible "time records" are just reproductions of pre-set schedules, the burden shifts to Defendants to prove that they paid employees properly. *See Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 254-55 (S.D.N.Y. 2008) ("In the absence of documentation, the employee may rely on [their] own recollection to meet [their] initial burden, in which case the employer must proffer evidence sufficient to rebut that recollection.") (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).

Class members worked past their pre-scheduled shifts for reasons similar to why they worked through their auto-deducted meal breaks. Clarice Robinson relates that she worked past the end of her shifts because "emergencies would come up with clients and you couldn't just

leave." Indeed, she and other Class members were specifically instructed "during that meeting that if a client issue comes up that you have to stay past your shift to help." **Exhibit 3** at 18. Similarly, Akeem Ford explains that if "a client won't be in the facility the whole day, and then finally decides to come in at 5:10 when you're about to leave and you still need to get the information on whatever task the client has to complete, you still have to get that done, so that would take up time out your day, because you might not see them tomorrow." **Exhibit 3** at 21.

Class members were placed in an impossible position. They had to stay past their shifts because, as Clarice Robinson put it, "[y]ou could get written up like if you didn't stay past your shift." **Exhibit 3** at 19. Melysa Exolas states that "if I did not work past my shift, it would be a write-up, and I did not want that on my record." **Exhibit 3** at 8. Similarly, Josephine Rivera recounts that she worked late because "[m]y job depended on it. I was not asked in a way. It was more of a demand, and behind the demand it was like a threat of my job." **Exhibit 3** at 50. Notwithstanding this requirement, Plaintiffs and Class members could not record this additional time because, as confirmed by Defendants' own representative, "employees who clocked out after their scheduled times would be subject to verbal reprimand." Order at 14. Plaintiffs and Class members were thus placed in a Catch-22. Defendants' policies required overtime work but effectively prohibited the recording of that work.

Beyond the standard ruses, there was also the fact that managers with the power to authorize overtime might not even be around after the end of standard shifts. Asked whether managers or supervisors would authorize her to work past her shifts, Ms. Robinson responded, "No because they weren't there past five o'clock." **Exhibit 3** at 19. So, Class members would have to stay past the end of shifts whenever a client popped up at their office, yet there was no one around to authorize such work, allowing Defendants to then refuse to pay overtime on the pretext

that the employee should have requested overtime authorization in advance. Even if there was a supervisor present afterhours, that would not suffice to obtain overtime authorization even if a limited number of overtime hours was theoretically available to the employee. A May 9, 2017, memorandum to employees sent by Defendants' Senior Vice President of Human Resources and Talent Management, Katrina Jones, states: "The supervisor determines if overtime is needed; supervisor obtains approval from Program Director." **Exhibit 6**. So, even if a supervisor is present and believes overtime is warranted, the overtime cannot be authorized without the Program Director's approval, and there is no guarantee that this individual will be available when the need for overtime arises. The memorandum also provides that "Supervisors will endeavor to give employees advance notice of overtime assignment when practicable," thereby conceding that advance notice is not always practicable. As it will often be impossible to contact the Program Director on short notice, the overtime work will then have to be ordered without being authorized, which is exactly what all the Plaintiffs and Opt-In Plaintiffs have related.

Defendants' overtime pre-authorization policy might make sense in some work settings, but it assuredly does not in Defendants' hectic and emergency-filled workplace, where all manner of unpredictable contingencies necessitated overtime work without warning. Donna Gittens, for instance, explains that whether she had to work past her official shift could turn on when children returned home for the home visits she was required to make:

> I never received the -- the compensation for the overtime. And it was mandatory that we did the home visits. So we work from 9:00 to 5:00. If the child is in school and they have after school, they usually coming home around 4:00, maybe getting back home by 5:00. And I didn't just have to go to one place. It was not one borough. It's either Long Island, Staten Island, Queens, Bronx. And I don't have a car, so -- and we had to make those home visits and it's all documented.

**Exhibit 3** at 54.

Asked whether she requested permission for overtime work before or after the fact, Cayon

Dennis explained:

> I didn't know I was going to be stuck in traffic. I went to regularly take clients out for
> housing tours, show them the place, do paperwork, pick up checks at Beaver Street, come
> back all the way to Queens, and I was stuck in traffic. So if I'm calling that same time I'm
> in traffic saying I'm with the driver, we're coming back with clients, and there's nothing I
> could do. And I was told they're not going to change the time sheet, or they would change
> it, and then it would not happen. I wouldn't get paid for it.

**Exhibit 3** at 26.

Again, we see that Defendants employ a variety of tactics, by either outright refuse to pay

overtime, or acknowledging it should be paid while deliberately it to fall through the cracks.

Defendants' Senior Vice President of Human Resources and Talent Management, Katrina Jones,

acknowledged that Defendants' stated overtime pre-authorization policy is unworkable in practice:

> Q. Okay. So, you know, a person may have worked, let's say, nine hours for four days,
> right, and then on the fifth day they would be hitting overtime hours on that day, but they
> wouldn't know that they're going to be hitting overtime on that fifth day, right?
> MS. BHUTANI: Note my objection.
> A. They should.
> Q. Why do you think they should, ma'am?
> A. If they're working additional hours each day, they would know that.
> Q. You're saying usually each employee should be tracking their own hours, right?
> A. If practical, yeah.
> Q. Okay. Okay. And then -- and so according to this, they would need to get prior
> authorization in the middle of the workday on Friday to keep working?
> MS. BHUTANI: Objection to form.
> A. I don't know.
> Q. Well, I mean, I believe that's what that policy would entail, right, if a person worked
> nine hours a day for four days, that's 36 hours. And after they worked four hours on Friday,
> then they would be hitting overtime and they would need to get prior authorization before
> they could do anymore work. Is that right?
> MS. BHUTANI: Objection to form.
> A. That's not correct.
> Q. What's not correct about it?
> A. Requiring authorization in the middle of a scheduled shift.
> Q. Okay. You've never seen that happen, right?
> A. No.
> Q. So would agree that your policy is impossible to follow?
> MS. BHUTANI: Objection.
> A. It could be worded differently.

**Exhibit 7** at 62:6-63:19.

Despite Ms. Jones's concession that Defendants' overtime approval policies "could be worded differently," she confirmed that "Employees who fail to adhere to organization and/or departmental procedures for overtime approval will be subject to disciplinary action up to and including termination." *Id.* at 64:7-11. Defendants' overtime pre-approval policies cannot be adhered to as a practical matter, and yet non-adherence will lead to discipline and potentially termination, so Class members just worked the overtime without strenuously insisting on their overtime pay. *That* is why Ms. Jones has never seen employees request overtime authorization in the middle of shifts notwithstanding that the *need* for the overtime hours would typically arise in the middle (or end) of shifts, as confirmed by all the testimony quoted here, because Class members understood the futility of it all.[2]

Defendants' disingenuousness is betrayed by Ms. Jones's May 9, 2017, memorandum to employees (**Exhibit 6**), which includes the following two statements:

> Employees must adhere to their set schedule when scanning in and out. for example, if the start time for employee is 9 AM, employee may not scan in earlier than 9 AM; if employee's schedule ends at 5 PM, employee must scan out at 5 PM

> Employees may not arrive prior to scheduled shift or remain in the building after they have finished their assigned work unless they have obtained specific authorization to do so from their supervisor or manager.

Defendants are very *strict* about when employees must scan out, at the end of their scheduled shifts, but they are much more *flexible* about when employees must actually leave the premises, which is *not* the time they scan out but whenever "they have finished their assigned work." So, Defendants clearly contemplate a situation where employees will scan out at the end of official shifts but remain in the building for as long as it takes to finish assigned tasks. That is the very definition of unlawful off-the-clock work.

---

[2] While hours worked past regular shift schedules on, say, a Tuesday may not technically qualify as overtime, given how early that is in the pay period, those hours are functionally destined to become overtime hours given the employee's obligation to appear for their regular shifts over the rest of the week.

Another reason Defendants' various stratagems succeeded was that Defendants could usually avoid being explicit about the fact that they were directing overtime work. Karen Brehm-Callaci explains that one source of her overtime hours was "case conference meetings," which "would run like an hour over my time." **Exhibit 3** at 38. Rather than directly ordering employees to work overtime—and thereby call attention to the issue of overtime pay—Defendants would simply schedule conferences or assign tasks at times that would inevitably lead to overtime work. Tyrone Wallace states, "Mr. Pierre telling me like, Have this done before you leave. Have this done before you leave sounds like overtime to me. So if I leave at seven, eight o'clock and I'm not paid for it because I was supposed to get it done before five o'clock, that doesn't, you know, that was an issue for me." **Exhibit 3** at 4. Defendants knew that that in instructing employees to complete a task before leaving they were really instructing them to perform overtime work, given the nature of the tasks assigned. But by feigning uncertainty about how long the task would take, Defendants could avoid directly broaching the issue of overtime work—and by extension of overtime pay. As Plaintiff Neor aptly puts it, the overtime work requirements were always presented to employees "under the guise of like needing the coverage for whatever was going on that day." **Exhibit 3** at 1. The following testimony from Neor illustrates how the game was played:

> Q. Did Ms. Vasquez, Ms. Follweiler or Mr. Carridice approve you working past four o'clock?
> A. They knew they had sent me out on the work trip, so, yes.
> Q. Did you ever have to submit any type of documentation for authorization to work late or work overtime?
> A. No.
> Q. Do you know if authorization was typically required before you worked past four o'clock?
> A. Yes.
> Q. What's the process for obtaining authorization?
> A. That they have notice that you're working over your hours.
> Q. Did you have to inform them?
> A. No. They were aware I was working over my hours because they were the ones who instructed me to do the task.
> Q. But did you have to inform them in any other way? Did you have to give them heads-up that you were working late or submit any type of documents to show that?

A. No. They are tasks that they assigned.

**Exhibit 3** at 2.

Plaintiffs' and Opt-In Plaintiffs' testimonies are compelling, and that testimony is further confirmed by Defendants' own documentary evidence, as emails produced by Defendants prove that that Class members were working outside the hours for which they were compensated. **Exhibit 8** illustrates this with about two sample emails from each Plaintiff and Opt-In Plaintiff, showing that these emails were sent one, two, or even three hours after the employee was no longer being paid. The chart references other exhibits that substantiate this (with the emails and time records themselves) and provides a brief summary of the communication. Of course, Plaintiffs do not claim that every Class member sent off-the-clock emails on every single day of their employment. Class members' primary duty was to help people in troubled circumstances, not to send emails. But the emails provide indisputable documentary support for the allegations discussed above, and many of them were sent to supervisors and directors, refuting any suggestion that Defendants were unaware that their employees were routinely performing uncompensated work.

## IV.   PLAINTIFF SATISFIES ALL REQUIREMENTS OF RULE 23

Rule 23 provides that a court should certify a class where, as here, plaintiffs satisfy each of the four conditions of Rule 23(a) as well as one of the three requirements of Rule 23(b). *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *In Re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ("A district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met.").

Specifically, under Rule 23(a), plaintiffs must demonstrate that:

(1)   the class is so numerous that joinder of all members is impracticable;
(2)   there are questions of law or fact common to the class;
(3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are generally referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Then, under Rule 23(b)(3), plaintiffs must demonstrate that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Courts also require that a class's membership be ascertainable. That is not an issue here, given that the law requires Defendants to keep employee records.

When considering whether the requirements of Rule 23 have been met, "a court may not address the merits of the action except to the extent that a merits issue overlaps with a Rule 23 requirement." *In re Fosamax Prod. Liability Litig.*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008). *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). Ultimately, "[t]he dispositive question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Kowalski v. YellowPages. com, LLC*, 2012 WL 1097350, at *12 (S.D.N.Y. Mar. 31, 2012)).

The requirements of Rule 23 tend to overlap or merge with each other, so courts are to "adopt a standard of flexibility," *Marisol A. v. Guiliani*, 126 F.3d 372, 376 (2d Cir. 1997), and "are encouraged to construe the requirements of Rule 23 liberally in order to effectuate its overall purpose." *Niemiec v. Ann Bendick Realty*, 2007 U.S. Dist. LEXIS 98840, at *16 (E.D.N.Y. Mar. 30, 2007). "These purposes include the protection of small claims through aggregation and promoting judicial economy." *Id.* (citation omitted). *See also Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 560 (2d Cir. 1968) ("[T]he class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would

27

otherwise be too small to warrant individual litigation."). In addition, "it is appropriate for the court to consider the inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually." *Id.* (citation omitted).

Accordingly, courts generally "take a liberal rather than a restrictive approach in determining whether the plaintiff satisfies Rule 23's requirements and may exercise broad discretion when determining whether to certify a class." *Spread Enters., Inc. v. First Data Merchant Servs. Corp.*, 298 F.R.D. 54, 66 (E.D.N.Y. 2014) (citing *Flores v. Anjost Corp.*, 284 F.R.D. 112, 122 (S.D.N.Y. 2012). Indeed, "[c]ourts in this Circuit have displayed a preference for granting rather than denying class certification." *Morris v. Alle Processing Corp.*, 2013 U.S. Dist. LEXIS 64534, at *15 (E.D.N.Y. 2013). When taken together, the declarations, deposition testimony, and documentary evidence submitted with this motion clearly establish the prerequisites for class certification under Rule 23.

### A.  The Class Is So Numerous that Joinder Is Impracticable

Although there is no rigid numerical threshold for measuring the impracticability of joinder, the Second Circuit has stated that "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995); *Iglesias-Mendoza v. La Belle Farm, Inc.*, 239 F.R.D. 363, 370 (S.D.N.Y. 2007). *See Ansari v. New York Univ.*, 179 F.R.D. 112, 114 (S.D.N.Y. 1998) ("courts will find that the 'numerosity' requirement has been satisfied when the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer"). "[P]laintiff need not present a precise calculation of the number of class members" and the Court may "rely on reasonable inferences drawn from available

facts," provided that the plaintiff presents "some evidence of or reasonably estimate the number of class members." *Flores*, 284 F.R.D. at 123.

Here, the numerosity requirement is satisfied by Defendants' own representation that "Our Network comprises 100+ affiliates and related entities, with over 2700 employees across four boroughs in New York City, Buffalo, Albany, Dunkirk, Rochester, and Syracuse in New York State …" (the "About" page of Defendants' website, also available at: https://acacianetwork.org/about/.). Even if some small fraction of this number consists of exempt employees who are ineligible to be Class members, there is no doubt that there are more than enough non-exempt employees who are eligible.

## B.  Commonality and Typicality Requirements Are Met

The commonality and typicality requirements "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 n. 5 (2011). "As a result, the commonality and typicality requirements tend to merge into one another, and similar considerations animate the analysis" of the two requirements. *Marisol A.*, 126 F.3d at 376.

Commonality is met when there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). It requires that the claims of the proposed class "depend upon a common contention" "that is capable of classwide resolution." *Dukes*, 131 S. Ct. at 2551. It "does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment." *Garcia*, 281 F.R.D. at 105 (citing *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y. 2008)). *See Velez*

29

*v. Majik Cleaning Serv.*, 2005 U.S. Dist. LEXIS 709, at *9 (S.D.N.Y. Jan. 18, 2005) ("The commonality requirement may be met when individual circumstances of class members differ, but their injuries derive from a unitary course of conduct."). "[C]ourts have <u>liberally construed</u> the commonality requirement to mandate a <u>minimum of one issue common</u> to all class members." *Garcia*, 281 F.R.D. at 105 (emphasis added). *See Dukes*, 131 S. Ct. at 2556 ("Even a single [common] question will do.").

Typicality requires that the claims of Plaintiff are typical of the claims of the Class. *See* Fed. R. Civ. P. 23(a)(3). It is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A.*, 126 F.3d at 376. "As with commonality, typicality need not be complete." *Damassia*, 250 F.R.D. at 157. Typicality "does not require that the factual background of each named plaintiff's claim be identical to that of all class members." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999). *See also Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002) ("Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding."); *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 86-87 (S.D.N.Y. 2001) (If "the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.").

There is more than enough evidence to demonstrate that "there is at least 'one issue common to all class members' that provides the 'unifying thread' which serves to bind the claims of the class members together." *Martinez v. Ayken, Inc.*, 2016 U.S. Dist. LEXIS 25556, at *28

(E.D.N.Y. Feb. 29, 2016). Here, there are a number of questions common to the Class. These include:

> (1) Whether Defendants automatically deducted purported meal breaks from Class members compensable hours;
>
> (2) Whether Class members were routinely required to work through these meal breaks;
>
> (3) Whether Class members' duties routinely required them to work past the end of their official shifts;
>
> (4) Whether Defendants' officially prohibited Class members from working past their scheduled shifts while unofficially requiring it;
>
> (5) Whether Defendants had a set number of overtime hours they were prepared to recognize and were unwilling to compensate overtime work once this "supply" ran out;
>
> (6) Whether Defendants systematically erected barriers to prevent or minimize the reporting compensation of overtime hours;

That these common questions admit of common answers is shown by the answers that Defendants have already supplied. As noted above, the Court has already found, based on Defendants' own representations, that "neither the department of human resources nor payroll tracked the actual hours employees spent on lunch and that Defendants had an auto-deduction policy of employees' lunch hours from their pay," Order at 13, and that "employees who clocked out after their scheduled times would be subject to verbal reprimand." Order at 14.

### C.  Plaintiffs Will Adequately Represent the Class

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied where "(1) plaintiff's interests are [not] antagonistic to the interests of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Satisfaction of the typicality requirement "is strong evidence that [the plaintiffs'] interests are not antagonistic to those of the class; the

31

same strategies that will vindicate [the plaintiffs'] claims will vindicate those of the class."

*Damassia*, 250 F.R.D. at 158.

In order to defeat class certification, "the conflict [of interests] must be 'fundamental.'"

*See Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.)*, 280

F.3d 124, 145 (2d Cir. 2001). While the courts have yet to explicitly define a "fundamental"

conflict, it was held to exist when "the interests of the class representative can be pursued only at

the expense of the interests of all the class members." *Literary Works in Elec. Databases Copyright*

*Litig. v. Thomson Corp.*, 654 F.3d 242, 259 (2d Cir. 2011). Further, it is worth noting that even "in

the event a fundamental conflict does exist, it can be ameliorated by separating the class into

'homogeneous subclasses . . . with separate representation to eliminate conflicting interests.'"

*Martinez*, 2016 U.S. Dist. LEXIS 25556, at *31 (quoting *Literary Works*, 654 F.3d at 259).

Here, the proposed Class representatives have stated their willingness, and demonstrated

their ability, to adequately represent the Class by sitting through depositions and submitting

declarations. *See* Chestnut Decl. ¶¶ 10-12; Exolas Decl. ¶¶ 9-11; Neor Decl. ¶¶ 15-17; Robinson

Decl. ¶¶ 9-11; Wallace Decl. ¶¶ 13-15. *See Flores*, 284 F.R.D. at 130 ("Courts in this [C]ircuit

have found that plaintiffs' affidavits can properly satisfy evidence adequacy."); *Hamelin v.*

*Faxton-St. Luke's Healthcare*, 274 F.R.D. 385, 396 (N.D.N.Y. 2011) ("The affidavits of the

named plaintiffs exhibit sufficient knowledge concerning the class claims."); *Leone v. Ashwood*

*Fin., Inc.*, 257 F.R.D. 343, 352 (E.D.N.Y. 2009) (finding adequacy based on plaintiff's affidavit).

### D.  Common Questions of Law and Fact Predominate

Rule 23(b)(3) requires that common questions of law or fact not only be present but also

"predominate over any questions affecting only individual members, and . . . [that a] class action

is superior to other available methods for the fair and efficient adjudication of the controversy."

Fed. R. Civ. P. 23(b)(3). Plaintiff has met the various criteria under Rule 23(a), and this is perhaps the best indicator that Rule 23(b)(3) is satisfied. *See Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986) (satisfaction of Rule 23(a) "goes a long way toward satisfying the Rule 23(b)(3) requirement of commonality"); *Trinidad v. Breakaway Courier Sys., Inc.*, No. 05 Civ. 4116, 2007 U.S. Dist. LEXIS 2914, at *22 (S.D.N.Y. 2007) ("The proposed class satisfies the requirements of Rule 23(b)(3) for many of the reasons discussed above [in discussion of Rule 23(a)]."). In fact, "numerous courts have found that wage claims are especially suited to class litigation—perhaps the most perfect questions for class treatment—despite differences in hours worked, wages paid, and wages due." *Poplawski v. Metroplex on the Atl., LLC*, 2012 U.S. Dist. LEXIS 46408, at *27 (E.D.N.Y. Apr. 2, 2012).

Under Rule 23(b)(3), common questions of law or fact predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individual proof." *Moore v. Painewebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002); *Mendoza v. Casa De Cambio Delgado, Inc.*, 2008 U.S. Dist. LEXIS 61557, at *24 (S.D.N.Y. Aug. 12, 2008). *See Rosario v. Valentine Ave. Disc. Store, Co*., 2013 U.S. Dist. LEXIS 77183, at *31 (E.D.N.Y. May 31, 2013) (the predominance requirement is a "stricter version of the Rule 23(a) commonality requirement").

Predominance has been satisfied here because the only issue that would be subject to individual proof would be damages. To the extent that Plaintiff and Class Members "have different damages, depending on the length of time they were employed, the wages they received, and the hours they worked, such questions do not defeat predominance." *Martinez,* 2016 U.S. Dist. LEXIS 25556, at *39. As detailed above, Defendants employed a variety of tactics to prevent the

33

recording and compensation of overtime hours. So, different Class members may have been subjected to some of these tactics more than others depending on their job duties and other circumstances. But these superficial variations all served the same underlying policy of depriving Class members of rightfully earned overtime. *See Gonzalez v. Nicholas Zito Racing Stable, Inc.*, 2008 U.S. Dist. LEXIS 27598, at *22 (E.D.N.Y. Mar. 31, 2008) ("factual variation among the circumstances of the class members is inevitable and does not defeat the predominance requirement.").

Establishing predominance does not require delving into the personal accounts of individual Class members because Defendants' official policies are clearly calibrated to generate uncompensated overtime. Ms. Jones acknowledged that these policies are unworkable as stated and "could be worded differently." There is also Defendants' rule that employees must scan out at the exact end of their scheduled shifts but may remain in the building until they complete work assignments. And while the need for overtime work can arise unexpectedly, that work cannot be authorized without the Program Director, who may not be available even if the supervisor is. Since Class members cannot simply abandon their responsibilities to clients, the predictable end result is overtime work without overtime compensation.

### E.  Class Treatment Is Superior to Other Alternatives

"Courts in this Circuit . . . have found that permitting New York Labor Law claims to proceed as Rule 23(b)(3) class actions, along with FLSA collective actions, is a superior method." *Trinidad*, 2007 U.S. Dist. LEXIS 2914, at *25 (collecting cases). "Courts routinely hold that a class action is superior where . . . potential class members are aggrieved by the same policy, the damages suffered are small in relation to the expense and burden of individual litigation, and many

potential class members are currently employed by [the] Defendant." *Whitehorn v. Wolfgang's Steakhouse, Inc.*, 275 F.R.D. 193, 200 (S.D.N.Y. 2011).

Not only would a class action in the instant case allow for a "more cost-efficient and fair litigation of common disputes" than individual actions, but "it is likely the only device by which many of the proposed class members would obtain relief." *Garcia*, 281 F.R.D. at 108; *Martinez*, 2016 U.S. Dist. LEXIS 25556, at *42. *See also Iglesias-Mendoza*, 239 F.R.D. at 373 (finding it "extremely unlikely" that proposed class members would pursue separate actions where they were "almost exclusively low-wage workers with limited resources and virtually no command of the English language or familiarity with the legal system"); *Perez v. Allstate Ins. Co.*, 2014 U.S. Dist. LEXIS 130214, at *67 (E.D.N.Y. Sep. 16, 2014) ("In the instant case, the NYLL Class consists of hundreds of potential class members, most of whom are likely to have suffered a small economic loss if they prevailed on individual claims arising from the dispute that is the subject of this lawsuit. Therefore, few individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail, particularly when many of the putative plaintiffs have suffered economic loss of de minimis value.").

Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

### F. Plaintiffs' Counsel Should Be Appointed as Class Counsel

Rule 23(g) requires that an attorney appointed to serve as class counsel "must fairly and adequately represent the interests of the class." Plaintiffs' Counsel has been approved as class counsel in over 100 wage class actions and is amply qualified to represent the interest of the Class. *See* Lee Decl. ¶¶ 46-51.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs have satisfied all of the requirements under Fed. R.

Civ. P. 23. Therefore, Plaintiffs respectfully request that his motion for class certification be

granted in its entirety.

Dated: New York, New York                    Respectfully submitted,
      June 6, 2025

                       By:    */s/ C.K. Lee*

                            C.K. Lee, Esq. (CL 4086)
                            Lee Litigation Group, PLLC
                            148 West 24th Street, Eighth Floor
                            New York, NY 10011
                            Tel: (212) 465-1188
                            *Attorneys for Plaintiffs, FLSA Collective*
                            *Plaintiffs, and the Class*

## WORD COUNT CERTIFICATE

I hereby certify that this Memorandum of Law complies with Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York and the Court's Order granting leave to file the motion for class certification (Minute entry dated May 23, 2025).

Parties requested an excess of 10 pages for the memorandum of law in support of the motion and the opposition, and an excess of 5 pages for the memorandum of law in reply. Pursuant to Local Rule 7.1(c), each excess page amounts to excess of 350 words over the word limit of 8,750. With 10 pages of excess pages, the word count limit has been increased to 12,250.

This certificate certifies that the document complies with the word count limit. Compliance relied on the word count of the word-processing system used to prepare the document. The total number of the words in this Memorandum, exclusive of the caption, table of contents, table of authorities and signature block is 12,065 words.

Dated: June 6, 2025                     */s/ C.K. Lee*
                                        C.K. Lee, Esq.

37